VERMONT SUPERIOR COURT
Orange Unit
5 Court Street
Chelsea VT 05038
802-685-4610
www.vermontjudiciary.org

CIVIL DIVISION
Case No. 21-CV-00261



Cris O'Donnell et al v. Hope Clough et al

# FINDINGS, CONCLUSIONS, AND JUDGMENT

The present matter before the Court is a dispute concerning the location, use, and scope of a private right-of-way that was created in the 1970s and that touches and concerns both Plaintiffs' and Defendants' properties. Both sets of properties are located just west of Fairground Road and east of Interstate 91 in the Town of Bradford, Vermont. The parcels adjoin each other, with Plaintiffs Chris and Cheryl O'Donnell's lot located directly north of Defendants Hope and Michelle Clough's two abutting parcels located directly to the south.

Plaintiffs have brought the present matter as a declaratory judgment action seeking a ruling from the Court that (1) limits what portions of the right-of-way the Defendants may use and (2) determines the scope and limits of Defendants' right to use or occupy this right-of-way.

Defendants have disputed Plaintiff's proposed limitations, in terms of both the extent of the right-of-way available to Defendants and the proposed limits and scope to Defendants' use. In response to Plaintiffs' complaint, Defendants have filed four counterclaims alleging: (1) interference with Defendants' use of the right-of-way; (2) interference with Defendants' quiet enjoyment; (3) slander of title; and (4) common law indemnity for costs in protecting their property interests.

This matter came before the Court for a bench trial on October 7, 2024. At that trial, the Court took testimony and evidence from the parties concerning the right-of-way, its origins and deeded description, and history of use. Subsequent to this hearing, the Court closed the evidentiary record but allowed the parties to file proposed findings and conclusions of law, which the parties did within the time allotted by the Court.[1] Based on these filings, the Court makes the following findings and legal conclusions.

---

[1] Defendant's post-trial filings, include a number of new pieces of evidence and additional testimony, which were not introduced as part of the October 7, 2024 trial. The Court cannot accept such new evidence or testimony after the close of the trial, short of a showing under V.R.C.P. 60(b). Nothing in Defendants' filing indicates that they can met this standard for

## Factual Findings[2]

### I. *The Parcels and Right-of-Way involved in this case*

Plaintiffs Chris and Cheryl O'Donnell presently live on an approximately 1.52-acre parcel located in Bradford, Vermont. (Hereinafter the "O'Donnell lot.") The parcel lies at the northern end of town. It is bounded on the west by Interstate 91 and on its north by a landowner not involved in the present litigation. To the south the property is bounded by the Cloughs, who own both a homestead parcel and an undeveloped lot. At the boundary, there is a 50-foot-wide right-of-way. To the east of the property lies a square parcel owned by a landowner not involved in this litigation. A 50-foot-wide tongue of land, that is part of the O'Donnell lot, runs beside the square lot to Fairground Road. This tongue of land is also part of the right-of-way and serves as the O'Donnells' driveway. The O'Donnells have always accessed their property over this portion of their land since first purchasing property in 1985.

Defendants Hope and Michelle Clough own several parcels, located just to the south of the O'Donnell parcel. The Clough parcels include a 2.14-acre parcel with frontage along Fairground Road, where the Cloughs' house sits. (Hereinafter the "Clough homestead lot.") This lot is bounded on the east by Fairground Road, on the west by the Clough's undeveloped lot, and on the north by the square parcel owned by a landowner not involved in this litigation and by the O'Donnell lot. On the south side, the lot is bounded by lands presently owned by the Cloughs.

The Cloughs also own a 0.92-acre parcel of undeveloped land west of the Clough homestead lot. (Hereinafter the "Clough undeveloped lot."). This lot is bounded to the west by I-91, to the south by lands currently owned by the Cloughs, to the east by the Clough homestead lot, and to the north by the O'Donnell lot. This lot does not have any frontage along a public road.

---

admitting new evidence after the close of the trial. V.R.C.P. 60(b); see also *Pirdair v. Med. Center Hosp. of Vermont*, 173 Vt. 411, 415 (2002) ("Rule 60(b) is not designed to afford parties simply a second, better opportunity to litigate issues already contested and decided in a previous proceeding."). In addition to be being filed in an untimely manner and without showing that they are "newly discovered," the Court finds five additional reasons to exclude the proposed new evidence. First, the documents submitted by Defendants are largely cumulative and offer only incremental bolster to Defendants' case that if accepted would not alter the outcome of the Court's decision. Id. at 414–15. Second, the late filings, if admitted or considered, would deprive Plaintiffs of a procedural opportunity to challenge, reply to, or meaningfully respond to such filings. Third, Defendants' filings directly violate a clear order from the Court that limited post-trial filings to either proposed findings based on the existing and admitted evidence or briefing of the legal issues. Fourth, if allowed, Defendants' late filings would effectively require the Court to re-open the record to both parties, cause both sides additional delays and costs, and invite the back-and-forth that the Court sought to avoid. Fifth, Defendants while self-represented are still obligated to follow and be bound to the rules of civil procedure, which do not permit parties to submit new or additional evidence and testimony after the close of trial. *Zorn v. Smith*, 2011 VT 10, ¶ 22 (noting that pro se litigants remain bound by the ordinary rules of civil procedure). For these reasons, the Court has not relied upon any of Defendants' new evidence as part of its present decision.

[2] Neither party sought to introduce expert or opinion testimony in this case, but each side relied on their personal testimony and a mixture of publicly recorded deeds, maps, and surveys as well as photographic, video, and documents. As such, the Court in making its findings has reviewed the relevant deeds, documents, and exhibits as entered into evidence by the parties and has compared these records to the testimony offered by parties as fact witnesses.

While not the focus of the present litigation, both the Clough homestead and undeveloped lots are bounded to the south by lands also owned by the Cloughs. As explained below, the boundary between these sets of lots served as a dividing line between two sets of land sales and subdivisions started by Harlie and Beatrice Moore in 1966 and the early 1970s.

Finally, the right-of-way at issue in this case merits a brief description. As shown in a 1975 survey map, the right-of-way is 50 feet wide at all points. The right-of-way sits entirely on lands owned by the O'Donnells. It runs from Fairground Road, a public highway, west to the end of the neighbor's square-shaped lot. It then turns south and runs along the western boundary of the neighbor's square-shaped lot to the Clough homestead lot. At the Cloughs' lot, the right-of-way turns west again and runs along the two Clough lots to the Interstate-91 property where it end. This right-of-way is unpaved. The portion that runs west from Fairground Road has been improved to the quality of an unpaved macadam driveway, but the remainder of the right-of-way is unimproved grassy land. The evidence is that only the O'Donnells use this right-of-way on a regular basis and only those portions that act as their driveway and access the public road. Michelle Clough testified at trial that her family had occasionally used the right-of-way for large deliveries, such as furniture or appliances, but such use appears to have been limited. Apart from this, there was no evidence of any other party using the right-of-way.

II. *A Brief History of the Moore Family's Acquisition of Land on Fairground Road*[3]

In May of 1950, Harlie and Beatrice Moore purchased land on either side of Fairground Road in Bradford, Vermont from Lloyd and Mila Rogers. These lands included property that would eventually be subdivided into the Clough homestead and undeveloped lots and O'Donnell lots, among others. Upon purchase, the Moores immediately deeded a half-acre strip of this land to a Charles Taylor, with both a water easement and a right-of-way. In October 1952, the Moores subdivided their property. The Moores retained the portions of the property east of Fairground Road and a 7.5-acre parcel on the west side of Fairground Road, which was adjacent to the Taylor half-acre. (Hereinafter the "Moore homestead lot".) The Moores sold the remaining portions of land west of Fairground Road to the Weber family, where it became known as "Parcel 2." As part of this transaction, the Moores conveyed a right-of-way:

> [O]ver the driveway on the parcel of land reserved to the grantors by [the 7.5 acres of excepted land] hereof, said right-of-way being granted for the purpose of enabling the grantees to reach the land herein conveyed from the Fair Grounds [sic] Road and said

---

[3] The Court has conducted an extensive review of the parties' deeds and history of the properties to untangle the confusing web of claims and issues that have arisen in this case, particularly from the Defendants, who have asserted property rights and interests that are simply not supported by the language of the deeds or the history of the parties' and their predecessors in title's use of the properties.

right-of-way to be used by the grantees [the Webers], the grantors [the Moores], and the Charles G. Taylor land referred to above.

Pltf. Ex. 4.

In August 1959, the Webers deeded Parcel 2 back to the Moores along with lands dubbed "Parcel 1." Included in Parcel 1 were the lands that sit to the east along U.S. Route 5, which the Webers had purchased in 1949. The effect of this transferred effectively reunited Parcel 2's lands with the Moore homestead lot and the other Moore lands, which now consisted of lands east and west of Fairground Road.

### III. *1966 Sale of the Moore Homestead*

In May 1966, the Moores deeded their homestead lot to Gilbert and Dorothy Cole. The Moores "excepted and reserved from the force and effect of this conveyance the right of way over the driveway on the above premises granted for the purpose of enabling access to other lands from said Fairground Road." Pltf. Ex. 11. In October, the Coles subdivided this property convey half of it, including the portions with the house, to Warren and Laurette Sweet. As part of this conveyance, the Coles indicated that a quit claim deed had been executed on October 26, 1966 by the owner of the Taylor lot "and others" relinquishing their right of way interests to the driveway serving the house. The Coles kept the remainder of the property.

### IV. *The 1970-Era Subdivision*

In the early 1970s, the Moores subdivided their property on the west side of Fairground Road into eights lots.[4] This subdivision was later memorialized in a survey map entitled "Land Survey for Harley Moore Bradford, Vermont" dated May 1975 and recorded as Map 297 in the Bradford land records ("Survey Map"). Pltf. Ex. 27. The lots are identified by number, which run from south to north.[5] The land directly to the south of this 8-lot subdivision is the land still belonging to the Coles from the 1966 Moore homestead lot transfer.

---

[4] In one of the subsequent deeds, the reference is to a five-lot division. It appears that the Moores may have broken this 8-lot subdivision into two parts. For the purpose of this decision, it is uncontested from the evidence that Lots # 1, #3, #4, and #5 were part of the initial subdivision and that the 1975 survey map depicts eight lots all owned by the Moores in and around the early 1970s.

[5] For some unexplained reason, there is no Lot #2 on the survey map. Lot #1 is immediately adjacent to Lot #3, which abuts Lot#4 and so forth. The only clue to the missing Lot #2 is the Johnson parcel located north of Lot #1 and east of Lot #5 and south of Lot #6. This parcel appears to have been previously subdivided, and it was by the time of the Moore subdivision, a separately owned parcel with improvements.

The subdivision begins in southeast corner of the property[6] with Lot #1 bounded on the south by the Cole property and to the east by Fairground Road. Directly to the west of Lot #1 is Lot#3, and to the west of Lot #3 is Lot #4. To the west of Lot #4 is Interstate-91.

Moving north, the survey indicates an existing square-shaped lot with a house on Fairground Road owned by "Johnson." To the north and west of the Johnson lot is the 50-foot right-of-way, which is the subject of the present litigation. The 1975 survey depicts the right-of-way running west from Fairground Road, turning south to Lot #1 and #3 then running along the boundary with Lots # 3 and #4 to the Interstate-91. To the north and west of the right-of-way is Lot #5.

North of parcel 5 are four more lots, #6, #7, #8, and #9, that all run east to west with frontage on Fairground Road and end at Interstate-91. These lots are not involved in the present litigation and do not appear to have either involvement with or claims on the right-of-way.

### a. *The Clough House Lot (Lots #1 and #3)*

In October 1973, the Moores sold Lots #1 and #3 of their subdivision to Ralph and Hope Clough by warranty deed, which is of record in the Town of Bradford Land Records at Book 43, pages 269–71.[7] This parcel, which we have labeled the Clough homestead lot, consists of 2.14 acres of land. The metes and bounds of the 1973 deed and acreage described therein are consistent with the representations of the two lots in the 1975 survey. By extension, the description is consistent with the layout of the Clough homestead lot as it presently exists.

As part of the transfer, the 1973 deed includes the following language:

> There is included in this conveyance a non-exclusive but perpetual right to use a fifty foot wide right of way running along the northerly bound of the premises herein conveyed and extending from said Town Road No. 5 in a northwesterly direction along the norther bound of the premises herein conveyed.

Pltf. Ex. 7.

The evidence indicates that Ralph and Hope Clough built a house on these parcels, created a paved driveway that leads from their house to Fairground Road, and have treated the lots as a single, homestead parcel. In June 2012, the Cloughs added their daughter, Michelle Clough, to the deed in which all three

---

[6] The property in this subdivision comes from the Weber to Moore deed of August of 1959 described above and is a portion of the land that comprised Parcel 2 in that deed.

[7] In their post-trial memorandum, the Cloughs refer to an August 24, 1973 as the controlling deed. This appears to be a mistake as the deed conveying Lots #1 and #3 to the Cloughs is dates October 15, 1973. Even the post-trial exhibits that Defendants submitted contain the same October deed (although Defendants only submitted the first page). The August 24th date is referenced within the October deed as the date when the Bradford selectboard approved the subdivision. See Pltf. Ex. 7.

held the property as joint tenants with a right of survivorship.[8] The 2012 deed contains the same description of the lots and the same language regarding the non-exclusive easement. This deed is of record in the Town of Bradford Land Records at Book 126, Page 53. Pltf. Ex. 6.

> b. *The O'Donnell Lot*

In August of 1975, the Moores conveyed Lot #5 of their subdivision to Roger and Sherona Gilman by warranty deed, which is of record in the Town of Bradford Land Records at Book 45, pages 119–21. This parcel, which we have labeled the O'Donnell lot, consists of 1.52 acres of land. The metes and bounds of the 1975 deed and acreage described therein are consistent with the representations of the lot in the 1975 survey. By extension, the description is consistent with the layout of the O'Donnell lot as it presently exists.

The description of Lot #5 in this deed has two important details. See Pltf. Ex. 22.

First, the description of the land comprising Lot #5 and conveyed through the deed expressly includes all of the land on which the right-of-way is located. The description begins with a pin on Fairground Road and runs to its common boundaries with Lots # 6, #4, #3, and #1. By this express language, the deed gives the Gilmans title to this land. This description indicates that the right-of-way, to the extent that it exists, is an encumbrance on the land of Lot #5 because title to the underlying land has, through this Moore to Gilman deed, been included as part of Lot #5.

Second, there is no mention of the right-of-way in the deed.

In April 1978, the Gilmans conveyed the O'Donnell lot to Dana and Serena Haskell. The deed mirrors the 1975 deed and did not reference the right-of-way. Pltf. Ex. 21. In July of 1980, the Haskells conveyed the lot to Andrew and Penny Clark. Again, the deed mirrored the original 1975 deed description and did not mention the right-of-way. Pltf. Ex. 20. In September of 1985, the Clarks conveyed the lot to Cris O'Donnell. As before, the deed mirrored the prior deed descriptions and did not contain reference to a right-of-way. Pltf. Ex. 19. In December of 2002, Cris O'Donnell conveyed the lot to himself and his wife, Cheryl O'Donnell.[9] As with prior deeds, the description and omission of the right-of-way were consistent. Pltf. Ex. 17. Since 1985, Cris O'Donnell has lived in the house and has occupied the O'Donnell lot. Since 2002, Cheryl O'Donnell has also lived at and occupied the property.

---

[8] Ralph Clough passed away prior to the present litigation in 2016 and is survived by the Defendants, his wife and daughter.
[9] In 1992, Cris O'Donnell's first wife quit claimed her interest in the property to him as part of the couple's divorce. Nothing in that deed alters or reserves any rights or portions of the land. Pltf. Ex. 18.

### c. *The Clough Undeveloped Lot*

In February of 1975, the Moores conveyed Lot #4, of their subdivision to Gilbert and Dorothy Cole, which is of record in the Town of Bradford Land Records at Book 44, Page 418–20. This parcel, which we have dubbed the Clough undeveloped lot, consists of 0.92 acres. As described, the lot is situated between the Clough homestead lot and Interstate-91 with the O'Donnell lot to the north and lands owned, at the time, by the Coles to the south. The deed description is consistent with Lot #4 in the 1975 survey. In the deed, the Moores expressly did not deed any rights to Coles to use or access the right-of-way on Lot #5 because the Coles owned adjoining property to the south. The deed states:

> Since the within conveyed Lot No. 4 adjoins premises now owned by the said Coles as aforesaid, the right of way easement shown on said plan adjoining the within conveyed property on the north is not conveyed herein and any future desire on the part of the grantees, their heirs and assigns, for water service for the parcel herein conveyed shall be obtained by them through separate negotiations with the Bradford Water Commission.

Pltf. Ex. 12. At the time, the Coles owned a portion of the former Moore homestead lot, which lay to the south of lots #1, #3, and #4. The language of the 1975 deed expressly conveys Lot 4 to the Coles with the expectation that access shall not come from the Lot #5 right-of-way but would have to be developed through the Coles property to the south, which already had a driveway and right-of-way that lay near Lot #4.

In October 2000, Dorothy Cole deeded her interest in both the Moore homestead lot, which is labelled "Parcel 1," and to the Clough undeveloped lot, which is labelled "Parcel 2," to Curt and Marianne Barthel. The deed is of record in the Town of Bradford Land Records at Book 94: 124. In the deed, the transfer includes reference to several quit claim deeds transferred between the Coles and other parties involving rights-of-way. These transfers date back to 1966 and appear to only concern the Moore homestead parcel, as the Coles did not own or have rights to the Clough undeveloped parcel at the time. In September 2009, Cole issued a corrective warranty deed to the Barthels.

In June of 2014, the Barthels conveyed both the Moore homestead lot and the Clough undeveloped lot to Hope and Michelle Clough by quit claim deed. The description of these parcels are consistent with the earlier deeds. By this act, Hope and Michelle Clough became the owners of what had been Lots #1, #3, and #4 as depicted in the 1975 Moore subdivision map. They also became the owners of a portion of the Moore homestead lot to the south of Lots # 1, #3, and #4, across which access to Lot #4 had laid since the 1975 Moore to Cole deed.

### V. *Additional Clough Land Acquisitions*

In June of 1981, the Sweets conveyed their interest to their portion of the Moore homestead lot that the Sweets had received from the Coles in 1966. This conveyance, which is of record in the Town of Bradford Land Records at Book 53, Page 57–59, gave the Cloughs land that further south of their land, and when united with the 2014 Barthel purchase, gave the Cloughs title to the southern portion of the original Moore property on the west side of Fairground Road. While this deed references rights-of-way, they, like the earlier Cole deeds, address easements that correspond to the Moore homestead lots and not to the property that lay within the 1970 subdivisions. This understanding is demonstrated by a 2012 survey showing the Cloughs' land from the Sweets. Pltf. Ex. 28.

When the Cloughs acquired the other portion of the Moore homestead lot in 2014, this would have merged most of these interests so that the only rights-of-way necessary would have been to the Clough undeveloped lot or to other third parties lying to the south that may have acquired interests from the Cloughs predecessors in title. Such third-party interests, whether they do or do not exist, are not relevant for the purposes of the present Order.

VI. *Behaviors and Actions Concerning the Right-of-Way on the O'Donnell Lot*

Over the past several years, the Cloughs and the O'Donnells have had numerous disputes regarding the right-of-way over the O'Donnell lot. These disputes have included allegations that the O'Donnells have trespassed on the Cloughs' land; that the O'Donnells are placing logs over the Cloughs' water lines; that they are flying drones over the Clough property; that the O'Donnells are logging the Cloughs land; and that the O'Donnells are blocking the Cloughs' use of the right-of-way. The disputes also includes aggressive actions by the Cloughs, particularly Hope Clough, to assert ownership and control over the right-of-way. This included evidence and testimony of Hope Clough making threats toward the O'Donnells, driving away potential purchasers, and shouting at the O'Donnells from the right-of-way. There was also testimony from Hope Clough stating that she believes she owns the right-of-way and the O'Donnells' property as a result.

The evidence offered at trial was at best inconclusive on many of these claims. Despite the vehemence of the Cloughs' testimony, there was no evidence to show waterlines under the O'Donnells' log piles or any evidence to connect the O'Donnells to the Cloughs' reports of water pooling on their property. There was no evidence connecting the O'Donnells to the drones that the Cloughs claim have been flying over their property. There was no evidence of the O'Donnells physically blocking the right-of-way. Even the evidence of tree cutting was inconclusive, as the missing trees were within the powerline easement and the O'Donnells credibly testified that the alleged cutting was done by the power company pursuant to its easement.

The evidence did show Hope Clough cutting small trees and brush on the O'Donnell property outside the right-of-way and responding in an angry and threatening manner when asked to stop. It is painfully obvious from the testimony that the issue of the right-of-way has become a wedge between the parties and a constant source of vexation and exasperation for both sides. The Cloughs expressed anger at what they felt was an ongoing denial of their rights. The O'Donnells expressed frustration at a situation where they felt the Cloughs were acting aggressively toward them. Neither side established that they had been physically harmed by the actions of the other or established particular property damages that could be demonstrated by a preponderance of the evidence to be the responsibility of the other side.

This is not to say that the parties have been living in peaceful stalemate or ceasefire conditions. Rather both sides have been roiling each other with their commitment to their view of who owns the easement and what rights each side has.

**Conclusions of Law**

When interpreting a deed, the Court must first look to "the language of the written instrument because it is assumed to declare the intent of the parties." *Kipp v. Estate of Chips*, 169 Vt. 102, 105 (1999). The Court must read the whole document to "effect to every part." *Id.* (quoting *Aiken v. Clark*, 117 Vt. 391, 393 (1952). The Court should not engage in unnecessary speculation, and if the deed is unambiguous, the inquiry ends, and the terms are enforced as written. *Sanville v. Town of Albany*, 2022 VT 22, ¶ 14. A deed is ambiguous only if "reasonable people could differ as to its interpretation." Id. at ¶ 15.

I. *An Easement Appurtenant to the Clough Homestead Lot*

In this case, although there are several deeds and multiple parties buying and selling real estate, the evidence and deed language is fairly straightforward. First, the evidence indicates that the Moores created a subdivision in the early 1970s that included the four lots at issue here: Lots #1 and #3, Lot #4, and Lot #5. In October 1973, the Moores conveyed Lots #1 and #3 to the Cloughs. As part of this conveyance, the Moores also conveyed a "non-exclusive but perpetual right to use a 50-foot-wide right-of-way" over Lot #5. Pltf. Ex. 7. This conveyance was not a fee simple deed of land but rather the creation of an appurtenant easement. *Rowe v. Lavanway*, 2006 VT 47, ¶ 12. An appurtenant easement is a right across another's land intended to benefit a parcel, rather than an individual. Id. As such, appurtenant easements run with the land and may be passed along with the dominant estate from owner to owner, rather than extinguishing when the particular owner ceases to own the parcel (as it the case in a personal easement). Id.

The easement created in the October 1973 deed is a general right-of-way, which was deeded to the Cloughs before either of the two lots had been developed. It is also a non-exclusive easement, meaning that the Cloughs' right to use the easement cannot interfere with other's use of the easement.[10] In light of the later deeds, specifically, the February 1975 deed of Lot #4 to the Coles, the purpose of this easement could only have been for ingress and egress access or running utilities, like power or waterlines to the dominant lots.[11]

At the time of the October 1973 deed, only Lot #1 had frontage on a public highway. Lot #3 was effectively landlocked. If the Cloughs had chosen to develop the lots as separate parcels, then the right-of-way would have been a critical necessity for Lot #3 to access. The language of the deed, however, was not driven by necessity. Instead, it was a right granted to the Cloughs to use the non-exclusive easement for either lot. It is neither speculation, nor an unreasonable leap to understand that the Cloughs could have developed both Lots #1 and #3 around this right-of-way and used the area that they elected to develop as a driveway as yard. The fact that the Cloughs elected to develop their lots differently does not cancel or reduce their right to the right-of-way. As an easement appurtenant, this general right-of-way remains available to the Cloughs for the purpose of ingress and egress and for running utilities to their homestead lot.

Turing to the issue that the O'Donnell chain of deeds omit any reference to the right-of-way or easements, the Court concludes that the omission of such information does not affect the validity of the right-of-way or the Clough's deeded right to such a right-of-way. As the Vermont Supreme Court has long held, "an appurtenant easement passes with subsequent conveyances, even if the specific language of the right-of-way is not repeated." *Barrett v. Kunz*, 158 Vt. 15, 18 (1992) (collecting cases). In this case, the O'Donnells conceded this point in their briefing and agree that the October 1973 deed creates a right-of-way across a portion of their property for the non-exclusive benefit of the Cloughs. Based on this concession, the Court need not explore the issues of notice, cloud on title, or the Vermont Marketable Record Title Act (27 V.S.A. §§ 601, et seq.) that might come into play if a party sought to dispute whether a deeded easement was within the chain of title or of record for a purchaser to have or taken notice. See, e.g., *Gray v. Treder*, 2018 VT 137, ¶¶ 11–18 (analyzing the applicability of the Act to an easement not recorded in the servient estate's chain of title).

---

[10] By way of example, the non-exclusive nature means that the Cloughs could not site a shed or other structure on the easement that would effectively block the O'Donnells and others from using the easement. This restriction goes both ways, the O'Donnells may not use the easement in a similar, exclusive manner that would block the Cloughs or others from travelling along the right-of-way. *Rowe*, 2006 VT 47, ¶ 23 (noting that the use must be "in a manner that is reasonably necessary for the convenient enjoyment of the servitude") (quoting Restatement (Third) of Property Servitudes § 4.10 (2000)).

[11] Given the non-exclusive nature of the easement, the O'Donnells have similar rights to use this easement, and no use by the Cloughs could prevent or block the O'Donnells from using the easement to their similar benefit.

Given the express establishment of this easement, the Court also need not take up the issue of the condition of trees or shrubs within the right-of-way or the historic use or non-use of the right-of-way. As the Vermont Supreme Court has noted, once created by a deed, an easement may not be defeated by the natural growth of trees within the right-of-way or by non-use of the easement by the dominant estate. *Rowe*, 2006 VT 47, at ¶¶ 15, 16. To extinguish an easement, the servient estate would have to take affirmative steps that would constitute an ouster that was "open, notorious, continuous, hostile, and adverse possession" for 15 years. Id. In this case, the evidence is that the Cloughs have used the easement from time to time and have acted to clear and maintain the easement. Neither of these actions were necessary to maintain their right to the easement. The mere absence of any actions constituting ouster by either the O'Donnells or their predecessors in title was sufficient to preserve the Cloughs deeded easement appurtenant. Id.

II. *No Easement for Lot #4*

While the evidence demonstrates that the Cloughs have a right to the easement that runs across the O'Donnell lot, this right is limited to the Clough homestead lot. The deeds demonstrate that the Clough undeveloped lot was initially deeded in February 1975 to the Coles without the easement. As drafted, the deed expressly excluded any easement right running to Lot #4. As explained in the deed, this was because the Coles, who were taking ownership of the Lot#4 owned adjoining land on the other side of Lot #4 that included a driveway that could provide access and utilities to the lot. As such, Lot #4 does not include any rights to access or benefit from the right-of-way on the O'Donnell lot.

This conclusion is supported by three legal principles.

First, the scope of an easement is limited by the grant and may not be expanded without express permission of the grantor or its successor. *Post and Beam Equities Group, LLC v. Sunne Village Development Property Owners Ass'n*, 2015 VT 60, ¶ 57. The use of an easement must be consistent with the use contemplated at the time of its creation and may not be used "in a way that materially increases the burden on the servient estate." Id. (quoting *Rowe*, 2006 VT 47, at ¶ 22); see also *Greenberg v. Hadwen*, 145 Vt. 112, 116 (1984) (holding that a use that went beyond the original grant and interfered with the servient estate's reciprocal rights constituted an overburdening of the easement). In this case, the specific limitation on the easement at the time of the initial sale of Lot 4 was that it had no right to right-of-way. By trying to add the Clough undeveloped lot to the right-of-way through the deeded rights in the Clough homestead parcel constitutes an expansion of the original intent and an overburdening of the easement, and thus and cannot be allowed.

Second, when the Coles received Lot #4, they received it without a right to the right-of-way on the O'Donnell lot. When the Coles conveyed the lot to the Barthels, it came to them with the same limitation, and when the Barthels conveyed it to the Cloughs, it came without the right to access the right-of-way on the O'Donnell lot. This is because a party may only convey what they own at the time of the conveyance. *Vermont Shopping Center, Inc. v. Pettengill*, 125 Vt. 145, 149 (1965). From February 1975, forward, Lot #4 was conveyed without an easement right to the O'Donnell lot, and no subsequent owner, including the Cloughs have been in a position to expand or obtain this right. Short of a grant from the O'Donnells, as owner of the servient estate, there is no one else poised to grant an easement right to Lot #4.

Third, the February 1975 deed envisioned that access to Lot #4 would be found from the property to the south. At the time of the conveyance, the Coles owned an adjacent lot with a driveway near Lot #4. There has been no evidence to suggest that such an access point would not have been possible, and the evidence indicates that this driveway was used for other rights-of-way to other adjoining properties to the south. At no time since the February 1975 deed has Lot #4 or this southern parcel been held in separate ownership. Whether owned by the Coles, the Barthels, or the Cloughs, Lot #4 has always been accompanied by this adjoining southern parcel with access points for Lot #4. As such, there can be no argument that Lot #4 needs access to the O'Donnell lot by reasons of necessity. *Traders, Inc. v. Bartholomew*, 142 Vt. 486, 492 (1983) (noting that easement by necessity arise when a landlock parcel is created). In this case, Lot #4 was never landlocked. It was transferred in February of 1975 to an owner with adjacent access with the intent that the new owner would provide alternative access. This right of access through the southern parcel remains, and therefore, there is no right to the O'Donnell lot for necessity.

For these reasons, the Court concludes that the Clough undeveloped parcel does not have a right to use the right-of-way on the O'Donnell lot as a matter of fact and of law.

III. *Use and Maintenance of the Easement*

Given that the Cloughs' easement rights end at the end of their homestead lot, the Court finds that this boundary point also marks the end of the easement appurtenant. Any portion of the O'Donnell lot west of the boundary line between the Clough homestead lot and the Clough undeveloped lot is beyond the Cloughs' easement rights and is simply the property of the O'Donnells.[12] If the O'Donnells wish to put up a gate, fence, or other physical marker to mark this terminal of the easement, then they are free to

---

[12] Given that this portion of the property dead-ends at Interstate-91, there is no credible argument that this portion would be included in the easement appurtenant for either ingress/egress purposes or utilities for the Clough homestead lot.

do so as they own the land on which the marker is to be placed, and this portion of their land is not encumbered or subject to an easement.

As to the maintenance of the right-of-way, the evidence indicates that the Clough, particularly Hope Clough has had substantial difficulty performing such maintenance within the confines of the easement or in a manner that is consistent with the non-exclusive nature of the easement. The video evidence submitted along with Ms. Clough's testimony indicates that she believes the easement to belong to her fee simple, and that these rights give her claims to the O'Donnell lot beyond easement. This is simply not the case, and it is not supported by either the evidence or the law. In addition, the Court finds that the O'Donnells have not acted in any way that would have created an ouster of the Cloughs. The O'Donnells have not interfered with the Cloughs rights to transverse or use the easement. They have avoided conflict with the Cloughs and have behaved in a reasonable manner when Hope Clough has not.

To prevent future conflict, the Court orders that neither the Cloughs nor the O'Donnells, nor either party's agents or successors in interest, may construct barriers within the easement that would limit or prevent other parties from reasonably travelling or using the right-of-way.[13] The Court further orders that the O'Donnells shall be primarily responsible for maintaining the easement area, including removing trees or shrubs that would interfere with travel. The Court enjoins the Cloughs from performing maintenance, except as follows: the Cloughs may with permission from the O'Donnells, or the O'Donnells' successors in title, hire professional and insured landscapers to maintain the easement in a reasonable manner consistent with its present condition as an undeveloped area of land with naturally occurring plant growth. Such maintenance should only be to facilitate travel.

The Cloughs or their successors may also hire a professional, licensed and bonded contractors to perform improvements to the right-of-way, but such improvement may only be done at reasonable times and in a reasonable manner with the approval of the O'Donnells or their successors interest and may only be done to serve a specific purpose within the scope of the easement, which is limited to access (ingress and egress) and the running of utilities to the Clough homestead lot). Any such work may not interfere with the O'Donnells' right to use the right-of-way or to use their land in a reasonable manner. The O'Donnells or their successors may not unreasonably deny a maintenance or improvement proposal.

As to the issue of damages, the Court finds that neither side has proven any damages by a preponderance of the evidence, and no damages are awarded to either side. The Court finds that the allegations of trespass, timber trespass, or damages to the water systems were inconclusive, and that there

---

[13] Such provision would become moot if the O'Donnells or their successors purchased the Cloughs' interest in the right-of-way, or the Cloughs or their future successor elected to release their interests in the right-of-way.

is no evidence that either side's actions crossed over into property damages such that would merit an award of damages.

Finally, the Court finds no evidence to support Defendants' counterclaims concerning slander of title. *Massucco v. Kolodziej*, 2024 VT 76, ¶ 26 (holding that a party must show an ownership interest capable of disparagement, a published false statement about it, evidence of malice, and special damages to prevail on a slander of title claim). Nor does the Court find sufficient, substantial evidence of any interference with the Cloughs' right-of-way or the Cloughs' quiet enjoyment of their property. See *Jones v. Hart*, 2021 VT 61, ¶¶ 30–40 (requiring a claim of interference to include either a substantial physical interference or interferences that are more than "the petty annoyances of everyday life in a civilized community").

In this case, the evidence is that the Cloughs and O'Donnells have been for the past few years at odds over the scope, use, and meaning of the right-of-way. Neither party has committed substantial physical damage to the other's property. While the Cloughs have alleged such damage, there is no evidence linking that allegation to either the actions of the O'Donnells or any actual damages. For example, the Cloughs allege that the O'Donnells laid timber atop their water lines, but there was no evidence that the site where the timber logs were laid had water lines beneath them or that the O'Donnells had any intent to interfere with such lines. Similarly, the evidence the Cloughs offered regarding the drones provided no link to the O'Donnells. The sole link appeared to be a suspicion that only the O'Donnells would wish the Cloughs harm or would be motivated to harass them. Such allegations and suspicions might be possible, but the evidence and testimony does not make it probable as is the Cloughs burden in establishing such claims. See *Estate of George v. Vermont League of Cities & Towns*, 2010 VT 1, ¶¶ 18, 19 (noting that the civil burden of proof requires a party to establish the probability of their claims beyond 50% and not merely their possibility).

Finally, the evidence does not demonstrate the type of special or legal relationship that would give rise to a common law indemnity claim. See *Knisely v. Central Vermont Hosp.*, 171 Vt. 644, 646 (2000) (mem.) (noting that implied indemnification requires a special legal obligation or relationship between the parties that make it fair to shift responsibility for a loss from one party to another). In *Knisely*, the Court refused to require a contractor to indemnify a hospital for the contractor's failure to clean an operating room when the hospital had a non-delegable duty to ensure the room was properly clean and safe. In this present case, the Cloughs do not identify any special relationship or obligation that would oblige the O'Donnells to bear the costs of litigation or this dispute. As such, the Court finds no basis for the common law indemnity claim.

## ORDER

Based on the findings and conclusions, the Court makes the following determinations pursuant to 12 V.S.A. § 4711.

First, the Court determines that the Cloughs have a deeded, non-exclusive easement appurtenant over the O'Donnell lot. This easement is a general right-of-way 50 feet wide running from Fairground Road at the easternmost tip of the O'Donnell lot west to the end of the separately owned, square-shaped parcel, then running at the same width south to the Clough homestead lot and then west at the same width to the end of the Clough homestead lot as depicted in blue on Plaintiff's Exhibit 34.

Second, the Court determines that this easement does not run to or serve Lot #4, referred herein as the Clough undeveloped lot, which was expressly excluded by the Moores from the easement when the lot was created and sold.

Third, the Court determines that since the right-of-way terminates at the end of the Clough homestead lot, the O'Donnells may mark the end of this easement with a gate or other device to prevent encroachment or unlawful expansion so long as the device sits entirely outside of the easement and entirely on the property of the O'Donnells.

Fourth, the Court determines that the O'Donnells are best suited to perform regular maintenance on the easement, and it directs the O'Donnells and their successors in title to perform primary maintenance on the easement. The Cloughs are enjoined from performing maintenance on the right-of-way, except outlined in this Decision, which permits them to hire professionals to perform limited maintenance and improvements under specific conditions.

Fifth, the Court finds that the parties have not provided sufficient evidence to merit an award of damages. The Court denies these claims, and it awards no damages to either party.

Pursuant to this judgment, each side shall bear their own costs, fees, and expenses. This Decision constitutes a final judgment in this matter under V.R.C.P. 58.

Electronically signed on 3/5/2025 3:37 PM pursuant to V.R.E.F. 9(d)

Vermont Superior Court
Filed 03/05/25
Orange Unit

Daniel Richardson
Superior Court Judge

Joyce E. Mc Keeman
Assistant Judge

The Hon Laurel Mackin
Assistant Judge